# CASES

IN THE

# APPELLATE COURTS OF ILLINOIS.

## SECOND DISTRICT—JUNE TERM, 1880.

7  253
109  ¹162

### JAMES M. HUNTER

v.

### ELLA B. HUNTER.

1. SEPARATE MAINTENANCE.—To authorize a decree for separate maintenance for causes other than those for which a divorce will be granted, it ought at least, to be proved that there was reasonable danger of personal violence to complainant, or a persistent, unjustifiable course of conduct on the part of the husband, which would necessarily render the wife miserable if she continued to remain with him. In this case the evidence fails to show a sufficient cause to support a decree for separate maintenance.

2. A decree upon a bill for divorce, and separate maintenance, dismissing the bill for divorce, and entering a decree for separate maintenance is a final decree. It fixes the status of husband and wife.

APPEAL from the Circuit Court of Kankakee county; the Hon. FRANKLIN BLADES, Judge, presiding. Opinion filed December 4, 1880.

Mr. JAMES N. ORR, for appellant; cited Babbitt v. Babbitt, 69 Ill. 277; Angelo v. Angelo, 81 Ill. 251; Wahle v. Wahle, 71 Ill. 510.

Mr. C. R. STARR, for appellee; that no appeal lies in this case, it being a mere interlocutory order, cited Gage v. Eich, 56 Ill. 297; Woodside v. Woodside, 21 Ill. 207; Perhant v. Magaher, 4 Scam. 326; Myers v. Manny, 63 Ill. 211; Blake v. Blake, 80 Ill. 523.

LACEY, P. J.   This was a bill praying for divorce and separate maintenance, filed April 18, 1879, by appellee against appellant, charging cruelty.   After answer denying all the charges of the bill, the court, Dec. 8, 1879, submitted the following issue to the jury:

1st.   Has the defendant been guilty of extreme and repeated cruelty, as charged in the bill of complaint?   And if not,

2nd.   Has the defendant been guilty of such conduct and treatment towards the complainant as justified her in separating herself and living apart from defendant?

The jury, after hearing the evidence, returned into court the following verdict, to wit: "As to the first issue, we find the defendant not guilty; and, as to the second issue, we find the defendant guilty of such cruelty and treatment toward complainant as justified her in separating and living apart from defendant."

After overruling motion for a new trial, the court ordered that the bill relating to a divorce be and the same is dismissed, and complainant forever barred from recovering for the same cause therein alleged; and decreed that the plaintiff was entitled to a separate maintenance from defendant.

Appellant excepted to the decree providing separate maintenance, and has appealed to this court; and assigns for error the overruling of the motion to set aside the verdict of the jury as to separate maintenance, and not dismissing the bill as to separate maintenance, and that the court erred in decreeing separate maintenance to appellee, and in submitting both issues to the jury; and that the court erred in modifying instructions Nos. seven, eight and nine, and in refusing ten and eleven, offered by defendant, and in giving one, two, three, four and five for complainant; and in admitting evidence offered by appellee, and rejecting evidence offered by appellant.

In the view we take of the case, it will only be necessary to consider the action of the court in overruling the motion to set aside the verdict, and in passing a decree of separate maintenance, and in not dismissing the bill.

It appears from the evidence that the appellant and appellee were married in Kankakee county, Oct. 20, 1873, at the house of the father of appellee. That appellant had come to that county from Canada some years before. At the time they were married appellee was about twenty-one years old, and the appellant about twenty-four years old. They resided together on a farm for some five years, less fifteen days, parting Oct. 5, 1878. During all the time from the date of their marriage till about the 5th of July, 1878, they lived happily together, as she herself testifies. During all that time the utmost kindness prevailed between them; her husband never used any bad language to her; his intercourse with her and her family was the best. They stayed at her father's over night frequently; had dinners and social gatherings frequently; had a horse and buggy to use when she wanted.

They were in good circumstances, and as Mr. Bailey, the father of appellee, testifies, "Appellant worked hard—was industrious—seemed to progress well in business—was in good shape, almost out of debt. The surroundings about the house and farm were in good shape—he was a reasonably good provider, and he never heard any complaint." .

The husband allowed the wife to carry the pocketbook and spend what money she pleased. Mrs. Hunter, the appellee, told some of her neighbors that she was happy, and that she had the best husband that ever lived. The neighbors regarded appellant and appellee as a model husband and wife. But in an evil hour for the peace of this happy couple, a sister-in-law, sister of appellant, Eliza Hunter, came to reside in the family, and, as appears, on the invitation of appellee herself. Here was the origin of all the trouble. Miss Hunter was only twenty years of age—came into the family on the 26th of Feb., 1878, and remained till Aug. 27, 1878. No trouble occurred until the fifth of July of that year.

On the night of the 7th of July Miss Hunter and Willard,

brother of appellee, and the appellant, went to a dance. The oldest brother of appellee, James, and Miss Hunter, had a difficulty at the dance. Appellant played at the dance, and James was floor manager. After midnight and after supper there were three sets formed on the floor waiting for the music, when some one called out, "Bailey! why don't the music go on?" Bailey made no move until after the second call for music was made. Miss Hunter had gotten on to the stand used for the music and caller. James then went up and said, "Eliza, won't you get down? I want on this; I want this for the caller;" she took his hand and jumped down. She said she did not think it was nice because he called her "Eliza" when he spoke. She thought he ought to have said "Miss Hunter, won't you please get down?" Miss Hunter the next morning went into the room where appellee was, and commenced abusing her on account of her brother. She said she was better than James or any Bailey—that she was not going to take anything of the Baileys.

From so trivial an affair as this, it appears, all this trouble originated, which in a short time was to separate man and wife. The quarrel once started must continue. Miss Hunter and appellee, although at times apparently friendly, kept up their bickerings, in which the appellee claims the appellant took the part of the sister, which is denied by him. But nothing very serious occurred that would at all justify appellee in deserting her husband, until, as she claims, her husband on the 26th of August, 1878, choked and kicked her in the cellar, because she would not give up his revolver, which she had hidden, as she says, because she was afraid of him. This he utterly denies, and it is apparent that if anything of the kind occurred, her account of it was greatly exaggerated. No one about the house ever knew anything about it, and no marks of violence were ever seen. No mention of this alleged assault was made in the first bill filed by this appellee, which was dismissed on the day this one was filed, and from the action of appellee afterwards, it is apparent she did not consider it a very serious matter. Appellant, in order to allay the growing difficulty in his family, resolved to take his sister back home to Canada,

Hunter v. Hunter.

and in accordance started with her on the next morning, Aug. 27, at which time the appellee gave. her husband the revolver and bid him, as she says in her testimony, an "affectionate, good-bye." He kissed her and his mother-in-law a good-bye, on his departure for Canada in company with Eliza. On Sept. 6, 1878, she wrote her husband, who was then in Canada, a letter, addressing him as "dear husband," in which she gives an account of the affairs of the farm, telling him that things do not go on as rapidly as when he is at home; and in closing says, she "remains his ever loving and true wife." It appears that appellant was sick in bed a part of the four or five weeks while he remained in Canada at his father's. On Sept. 15th she wrote a second letter. In this letter she acknowledges the receipt of his, and says they were all in good health, expressing sorrow that he feels bad, telling him not to get discouraged; urges him to come home by Saturday next—says it is lonesome without him, and if he is not well she can do more for him than any person living. She then gives a long account of the farming operations, and also telling him how many cans of peaches, and how much apple-butter she and her mother were putting up. She says: "I will have lots of good things to feed you on, when you come home." Whatever had happened prior to that time, it does not seem that she regarded as of sufficient importance or seriousness to justify her in leaving him. Nor does the evidence disclose anything that would amount to a justification. On the 23d of the same month, September, she writes her husband another letter, not quite so full of expressions of affection and tenderness. She tells him that she expected to hear something about his coming home, but that he was further from it than ever, saying: "You say you are under your parents' roof, and could not think of leaving it and come home to die"—that he could suit himself, and stay altogether, if he liked—telling him he had been gone a month, and she did not propose to keep his house any longer than a week. Then, "I have as good a home as any Hunter can show, and I intend to go to it. I will give you a week to come home and live with me, or you can stay and *die* under your parents' roof. I will not be deviled to death by you and your lying

sister." She then speaks of letters that his sister, Eliza, had been writing back to people in the county, which she had read, and which seemed to offend her very much; telling her husband she does not think he is a true one. It seems the letters which Eliza had written back, together with the absence of appellant, were the exciting causes of the change in her feelings toward her husband.

Previous to the time when appellant went with his sister to Canada, the appellee *requested*, as she claimed, but as appellant claimed, *demanded*, to read one of the letters received by Eliza Hunter, from Canada. Miss Hunter refused this. Appellee thought Miss Hunter had been writing back to Canada something about her, and wanted to see this letter to ascertain. Her husband and herself had some words about this letter; he claiming the appellee demanded the letter, and she denying it. On Wednesday, Oct. 3, 1878, appellant returned from Canada, and got off the train at his farm, bringing with him his father and a Mr. O'Reiley, a friend of his. Appellee had been expecting him, or a telegram or letter, and had gone to Grant, a railroad station some miles off to meet him, but not meeting him and getting no word, went from there to her father's. Towards evening of Oct. 3d, appellee and her father went to appellant's house, and then found he had returned home in company with his father and O'Reiley.

Appellant told his wife on this occasion that he had brought his father with him to help sell out his things; that he intended to go to Juliet, Kankakee, or some other town—he did not care where. Appellee told him, under the circumstances, she was not willing to go. Appellant at this time had taken a dislike to Mr. Bailey, the father of appellee, and intended to sell out and go into some neighboring town, and go into the grocery business; he did not intend to go to Bailey's house on his return. He wanted to get away from her father's neighborhood. That night appellant and his wife slept together as man and wife. The next morning the father and mother of appellee came over again to appellant's house, and the subject of selling out was talked over.

Then again the subject of whether appellee demanded or re-

quested Miss Hunter to read her the letter, came up.  Appellee wanted it talked over in the presence of all—appellant desiring the subject to be dropped.  But when they once got into the discussion, he maintained his side and she maintained hers, till the discussion grew warm.  She claims her husband called her a liar, which he denies, and in which he seems to be corroborated.  Mr. Bailey then interfered, and threatened appellant, when Mr. Hunter, father of appellant, took Bailey out to the barn and the discussion ceased.  That night appellee went home with her father.  Mr. Bailey left word with the hired man of appellant to come over to his house the next day, which was Friday, but appellant sent him an outrageously vulgar message, and that he could not come.  Old Mr. Hunter, however, went over to Bailey's Friday and staid all night, and the next morning, Saturday, Mr. Bailey determined to take his daughter home, and she determined to abandon her husband.  Old Mr. Hunter, appellee, Mrs. Bailey and some others, went over to appellant's house with wagon and team, and took the most of the carpets and furniture away, breaking up the household.  Appellant, at the time this was going on, left the premises and went to one of the neighbors.  They never lived together since as husband and wife.

On the 9th of Oct. appellant sent appellee a letter, telling her if she would come back and live with him, he would give her a hearty welcome.  But she refused, and on the 15th of the same month commenced proceedings for divorce, which was afterwards dismissed, and this bill filed.

That both appellant and appellee have been in fault in this affair, in many instances, there is no reason to doubt.  They have not exhibited that kindly and considerate spirit under the circumstances that they ought to have done, but have unnecessarily allowed trouble to spring up over the most trivial matters.  Nor can we think the father of appellee is blameless.  He should have endeavored to allay the excitement and trouble, instead of making himself a party to the quarrel and aggravating the trouble between his daughter and appellant.  Appellant had a right to change his business and location, and

it was the duty of his wife to go with him wherever he thought proper to go. Babbitt v. Babbitt, 69 Ill. 277.

The appellant was certainly greatly in the wrong in sending so outrageous an insult to his father-in-law, Friday, Oct. 4th.

There was no systematic course of ill-treatment on the part of the husband, such as the law requires, to justify the wife in leaving him. In fact, she had not thought of leaving him, or at least had not determined on it till on Friday or Saturday, October 4 and 5, 1878. Nothing occurred after his return to justify such a course. In fact, in talking of the matter with Mrs. Morrison on Christmas night after the separation, in answer to the question put to her by Mrs. Morrison, " What does it mean that you and Jim do not live together?" Bursting into tears, she says: " I cannot tell." This appears to be a natural answer to such a question. The Supreme Court lays down as a rule " that to authorize a decree for separate maintenance of the wife, other than for causes for which a divorce will be granted, it ought at least to be proved that there was a reasonable danger of personal violence to her, or a persistent, unjustifiable course of conduct on the part of the husband, which would necessarily render her miserable if she continued to remain with him, and that the conduct of the husband was not in any considerable degree induced by her fault." Wahle v. Wahle, 71 Ill. 510. Tested by this rule, the evidence shows no such cause. Perfect harmony existed between the appellant and appellee, during all their married life, except for a few weeks in the month of July and August, and three or four days in October, 1878, and this was not of such a character as to show that appellee would be in the least danger of personal violence, or that her husband persistently abused her without her fault. We see no good reason in this case why the appellee may not live with the appellant as his wife, and be as happy in her married life as she was prior to the affair between James Bailey and Miss Eliza Hunter at the ball.

The decree of the court below we regard as final. It fixes the status of the husband and wife, and is as final as a decree of divorce would be. The decree of the court below is reversed,

and cause remanded, with directions to the court to dismiss appellee's bill.

Reversed and remanded.